IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| BUCKEL FAMILY WINE LLC, | **No. 4:23-cv-00256-RGE-WPK** |
| Plaintiff, | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| MARY MOSIMAN, Director of Iowa Department of Revenue, STEPHEN LARSON, Director of Iowa Alcoholic Beverages Division, BRENNA BIRD, Attorney General of State of Iowa, STEPHAN K. BAYENS, Commissioner of Iowa Department of Public Safety, | |
| Defendants. | |

## I.    INTRODUCTION

Plaintiff Buckel Family Wine LLC is a Colorado-based winery wanting to sell wine directly to Iowa retailers. In order to do so, they need a class "A" permit. But a class "A" permit is only available to wineries with premises in Iowa. As such, Iowa law currently prohibits out-of-state wineries from selling directly to Iowa retailers. In contrast, in-state wineries have the opportunity to do so. Because Iowa law allows in-state wineries to receive class "A" wine permits and sell directly to Iowa retailers but prevents out-of-state wineries from doing so, the Court finds Iowa law violates the dormant Commerce Clause of the Constitution of the United States.

For the reasons set forth more fully below, the Court grants Buckel's motion in part, grants Defendants' motion in part, and denies Defendants' motion in part.

## II.    BACKGROUND

### A.    Factual Background

There is no genuine issue in dispute as to the following facts. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

Buckel is a winery operating out of Gunnison, Colorado. Buckel Decl. ¶ 1–2, Pl.'s App. Supp. Mot. Summ. J., ECF No. 30-3. Buckel is licensed by the State of Colorado and the Federal Alcohol and Tobacco Tax and Trade Bureau. *Id.* ¶ 3. Buckel wants to sell wine directly to retailers in Iowa. *Id.* ¶ 5. Buckel contacted wine retailers in Des Moines, Iowa, to sell wine to those retailers, but did not—and will not—take additional steps toward selling wine to them because Iowa's laws prohibit out-of-state wine manufacturers from securing a class "A" wine permit. *Id.* ¶ 6, 12–14; Iowa Code §§ 123.30 (retail alcohol licenses), 123.173(2) ("All class 'A' premises shall be located within the state."). Iowa has a single wine permit, the class "A" wine permit, which authorizes entities with premises in Iowa to "manufacture and sell, or sell at wholesale, in this state, wine." Iowa Code § 123.173(2); *see* Defs.' Consol. Br. Supp. Mot. Summ. J. and Resist. Pl.'s Mot. Summ. J. 3, ECF No. 35-1.[1] Manufacturers of wine within Iowa, who necessarily hold a class "A" wine permit, may sell their wine directly to Iowa retailers. *See* ECF No. 35-1 at 3 (citations omitted). Because Buckel does not have premises within Iowa, Iowa law prohibits Buckel from obtaining a class "A" wine permit and thus from selling its own wine directly to Iowa retailers. *Id.* at 2–3.

Additional facts are discussed below as necessary.

---

[1] Iowa defines "licensed premises" or "premises" as "all rooms, enclosures, contiguous areas, or places susceptible of precise description satisfactory to the director where alcoholic beverages, wine, or beer is sold or consumed under authority of a retail alcohol license, wine permit, or beer permit. A single licensed premises may consist of multiple rooms, enclosures, areas, or places if they are wholly within the confines of a single building or contiguous grounds." Iowa Code § 123.3(29).

**B.      Procedural Background**

The operative instrument here is the amended complaint. Am. Compl., ECF No. 24. The amended complaint seeks a judgment declaring portions of Iowa Code §§ 123.3(40), 123.173(2),[2] 123.175(2)(c), and 123.176(9) as unconstitutional under the Commerce Clause. ECF No. 24 at 5; *see also* U.S. Const. art. I, § 8, cl. 3. Buckel also requests an injunction prohibiting Defendants from enforcing the residency restrictions in Iowa for the same provisions.[3] *Id.* Buckel and Defendants both move for summary judgment. Pl.'s Mot. Summ. J., ECF No. 30; Defs.' Consol. Mot. Summ. J. and Resist. Pl.'s Mot. Summ. J., ECF No. 35. Defendants argue Buckel lacks standing to challenge the residency restrictions because Buckel "is a limited liability company and not a sole proprietorship or partnership." ECF No. 35-1 at 13. Buckel does not contest this point but does not specify which specific provisions it does not have standing to pursue. *See* Pl.'s Consol. Br. Resist. Defs.' Mot. Summ. J. and Reply Supp. Pl.'s Mot. Summ. J. 4, ECF No. 36. The Court finds this concession applies to Buckel's requests for relief relating to its dormant Commerce Clause challenges against Iowa Code §§ 123.3(40) and 123.175(2)(c) because these challenges

---

[2] In the amended complaint's prayer for relief, Buckel seeks judgment "declaring that the provision in Iowa Code § 123.173(c) requiring that all class 'A' premises shall be located within the state of Iowa is unconstitutional under the Commerce Clause." ECF No. 24 at 5. The Court finds Buckel's use of subsection (c) in its amended complaint is a scrivener's error. The Court finds Buckel intended to cite to Iowa Code § 123.173(2) as Buckel did elsewhere in the amended complaint and throughout its briefing. *See* ECF No. 24 at 2; *see also* Pl.'s Br. Supp. Mot. Summ. J. 4–5, ECF No. 30-1; ECF No. 36-1 at 6, 9. The language in Buckel's requested relief and Iowa Code § 123.173(2) is almost identical. *See* Iowa Code § 123.173(2) ("All class 'A' premises shall be located within the state."). Additionally, the Iowa Code does not contain a section 123.173(c).

[3] Buckel seeks injunctive relief from Iowa Code § 123.175(c). The Court also finds this is a scrivener's error because the cited section does not exist. The Court finds Buckel intended to seek injunctive relief from Iowa Code § 123.175(2)(c) and thus mirror its prior request of the Court to declare Iowa Code § 123.175(2)(c) unconstitutional. *See* ECF No. 24 at 5. Buckel also appears to request injunctive relief from residency restrictions in Iowa Code § 123.173(2). However, Iowa Code § 123.173(2) contains no residency restriction.

center on citizenship and residency requirements. *See* ECF No. 24 at 5. The Court additionally finds Buckel concedes its requests for injunctions "prohibiting defendants from enforcing the residency restrictions" in Iowa Code §§ 123.3(40), 123.175(2)(c), and 123.176(9). Based on these concessions, the Court grants Defendants' motion for summary judgment in part as detailed below.

Buckel does not move for the Court to find Iowa Code § 123.176(9)—concerning native wine manufacturing licenses—unconstitutional in its motion for summary judgment, nor does it directly address whether it concedes this argument. *See* ECF No. 30 at 4 (listing the "laws at issue"); ECF No. 36 at 4. Notwithstanding arguments generally sweeping broadly, Defendants also do not directly discuss Iowa Code § 123.176(9)'s constitutionality. *See* ECF No. 35-1; ECF No. 37. The Court thus takes no action concerning Iowa Code § 123.176(9)'s constitutionality under the Commerce Clause. Buckel has ten days after the filing of this order to advise the Court of Buckel's intentions relating to Iowa Code § 123.176(9).

The Court finds the parties' briefing and exhibits adequately present the remaining issues without need for oral argument. *See* LR 7(c); Fed. R. Civ. P. 78(b). The Court decides the parties' motions as set forth below.

## III.   LEGAL STANDARD

### A.   Standing

"Federal courts are not courts of general jurisdiction and have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto." *Marine Equip. Mgmt. Co. v. United States*, 4 F.3d 643, 646 (8th Cir. 1993) (citation omitted). "Article III confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case—in other words, standing."

*Id.* (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997) (internal quotation marks omitted)). For a plaintiff to have standing, the plaintiff must show 1) an injury in fact, 2) causation, and 3) redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). For an injury to be redressable, it must be "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 561 (citation omitted). When determining whether an injury is redressable, "a court will consider the relationship between 'the judicial relief requested' and the 'injury' suffered." *California v. Texas*, 593 U.S. 659, 671 (2021) (citation omitted).

## B.     Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322−23 (1986). A genuine dispute of fact exists when a factual issue "may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250 (1986); *accord Torgerson v. City of Rochester*, 643 F.3d 1031, 1042–43 (8th Cir. 2011) (en banc) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." (citation omitted)). To preclude summary judgment, a genuine dispute of fact must concern a material fact—that is, a fact "that might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

Neither party suggests there is a genuine dispute as to any material fact. *See* ECF No. 30-1 at 5; ECF No. 35-1 at 9; *see also* ECF No. 36; ECF No. 37. Thus, the Court's task is to determine whether one of the parties is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

## C.     Standard Under the Dormant Commerce Clause and Section 2 of the Twenty-First Amendment

The United States has a long and complicated history with alcohol. *See Granholm v. Heald*,

544 U.S. 460, 472–86 (2005); *see also Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 518–33 (2019). Much has been written about alcohol licensing laws and the importation of alcohol into States in the post-Prohibition era. U.S. Const. amend. XVIII; U.S. Const. amend. XXI; *see Granholm*, 544 U.S. at 484–86; *Tenn. Wine*, 588 U.S. at 518–20; *Sarasota Wine Mkt., LLC v. Schmitt*, 987 F.3d 1171, 1175–76 (8th Cir. 2021); *Lebamoff Enters. Inc. v. Whitmer*, 956 F.3d 863, 867–68 (6th Cir. 2020); *B-21 Wines, Inc. v. Bauer*, 36 F.4th 214, 218–19 (4th Cir. 2022). The Court will not reiterate this intriguing history but will instead focus on the Supreme Court's modern jurisprudence about the dormant Commerce Clause's relationship with Section 2 of the Twenty-first Amendment, which states:

> The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited.

U.S. Const. amend. XXI, § 2.

Normally, when a state statute discriminates on its face against interstate commerce, it faces an almost certain finding of invalidity by a reviewing court. *Granholm*, 544 U.S. at 476 ("State laws that discriminate against interstate commerce face 'a virtually *per se* rule of invalidity.'" (quoting *Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978))); *Tenn. Wine*, 588 U.S. at 539 (noting that if a discriminatory law applied to all retailers, it could not be sustained). When the regulation, however, involves Section 2 of the Twenty-first Amendment, a reviewing court engages in a different inquiry. *Granholm*, 588 U.S. at 476; *Tenn. Wine*, 588 U.S. at 539. The parties dispute the exact standard the Court should apply in reviewing Iowa's wine laws.

Buckel argues when a State's alcohol laws are discriminatory under the dormant Commerce Clause, the State must justify them with "concrete evidence" showing that restricting

interstate commerce is "reasonably necessary" to protect against alcohol-related public health or safety risks. ECF No. 30-1 at 1 (citations omitted). In addition, Buckel asserts the State must demonstrate nondiscriminatory alternatives would be insufficient. *Id.* (citations omitted). Defendants assert "concrete evidence" is only required when the laws at issue are not "essential features" of a three-tier system. ECF No. 35-1 at 10–11. A three-tiered distribution system for alcohol exists where the law requires a manufacturer or producer to sell to a licensed in-state wholesaler who then sells to a licensed in-state retailer who then sells the alcohol to consumers. *Sarasota Wine*, 987 F.3d at 1176. The system is also one in which "[s]eparate licenses are required for producers, wholesalers, and retailers" of alcohol. *Granholm*, 544 U.S. at 466. Often, States also prohibit the different tiers from having a financial interest in a member of another tier. *Sarasota Wine*, 987 F.3d at 1176.[4] According to Defendants, if the contested law is an essential feature of a three-tier system, then the standard of review is similar to "rationality review" as applied in other constitutional inquiries. ECF No. 35-1 at 10–11. In support of their position, Defendants cite to the Supreme Court's decision in *Tennessee Wine* and the Eighth Circuit's decision in *Sarasota Wine*. *Id.* at 17. However, as will be discussed below, neither the Supreme Court nor the Eighth Circuit set forth a new analysis for determining the appropriate standard based on whether a law was an "essential feature" of a State's three-tiered system.

Based on the Supreme Court's analyses in *Granholm* and *Tennessee Wine*, the Court

---

[4] The primary purpose of the three-tiered system was to prevent the creation of a "tied-house" system. *Tenn. Wine*, 588 U.S. at 521 n.7. A tied-house existed where a manufacturer of alcohol "tied" a retailer to themselves by providing the retailer with certain benefits in exchange for that retailer only selling that manufacturer's alcohol. *Id.* Often, this system also required the retailer to meet sales requirements which would frequently result in excessive and irresponsible drinking. *Id.* To avoid this direct relationship between the manufacturer and retailer, many States implemented the three-tier system. *Sarasota Wine*, 987 F.3d at 1176.

largely concurs with Buckel regarding the correct standard. In *Granholm*, the Supreme Court consolidated two cases, one from Michigan and one from New York. Michigan's law allowed in-state wine manufacturers to sell directly to consumers after obtaining a license but prohibited out-of-state wine manufacturers from doing so. 544 U.S. at 468–69. New York's law authorized in-state wine manufacturers to sell directly to consumers after obtaining a permit but only allowed out-of-state wine manufacturers to do so if they had certain in-state premises. *Id.* at 470–71. The Supreme Court determined both laws discriminated against interstate commerce and the Twenty-first Amendment did not save them because they involved "attempts to discriminate in favor of local producers." *Id.* at 489. The Court held that analysis under the dormant Commerce Clause demanded more than "mere speculation" regarding a law's necessity to justify the States' discriminatory wine laws. *Id.* at 493. The Court also determined the States provided little "concrete evidence" in support of their assertions. *Id.* The Court noted the burden is on the State to show the discriminatory laws are "demonstrably justified." *Id.* Though the Court struck down Michigan's and New York's laws, the Court noted it had previously recognized three-tier systems as "unquestionably legitimate" under the Twenty-first Amendment. *Id.* at 488.

Twelve years later in *Tennessee Wine*, the Supreme Court upheld the basic idea that Section 2 of the Twenty-first Amendment does not sanction discriminatory laws. 588 U.S. at 535. The primary law at issue in *Tennessee Wine* concerned a two-year durational-residency requirement for new retailers wishing to open a liquor store in Tennessee. *Id.* at 510. The defendants in the case attempted to defend the law by claiming it was part of Tennessee's three-tier model and arguing that striking it down would go against *Granholm*'s approval of the three-tiered system. *See id.* at 535. After finding Tennessee's law facially discriminated against nonresidents, the Court responded to the defendant's argument by stating Tennessee's law was not

an "essential feature" of the three-tier system and "[a]lthough *Granholm* spoke approvingly of that basic model, it did not suggest that § 2 sanctions every discriminatory feature that a State may incorporate into its three-tiered scheme." *Id.* Thus, the Court merely responded to an argument by the defendants when it used the term "essential feature" and did not create a new analysis for determining the appropriate standard.

In reaching its decision, the *Tennessee Wine* Court set forth a two-step framework for assessing challenges to state liquor laws under the dormant Commerce Clause. First, the reviewing court must determine whether the law discriminates against interstate commerce. *Id.* at 539–40. If it does not, the case will end there. *Id.* If the law does discriminate, the court must assess "whether the challenged requirement can be justified [by the State] as a public health or safety measure or on some other legitimate nonprotectionist ground." *Id.* at 539. Protectionism, the Court stressed, is not a legitimate State interest under Section 2. *Id.* at 531. In reviewing the purported interests for Tennessee, the Court held the defendant must show with "concrete evidence" that the law is "reasonably related" to the State's asserted interests and "that nondiscriminatory alternatives would be insufficient to further those interests." *Id.* at 533, 540. The Supreme Court held the law violated the dormant Commerce Clause and was unconstitutional because it was not supported under this standard of review. *Id.* 539–43.

More recently, the Eighth Circuit addressed challenges to Missouri's alcohol distribution laws in *Sarasota Wine*. The primary challenge centered on an amendment to these laws which allowed in-state retailers to ship alcohol to consumers but did not allow out-of-state retailers to do so. *Sarasota Wine*, 987 F.3d at 1176. The Eighth Circuit highlighted that the Supreme Court in *Tennessee Wine* "distinguished between the two-year residency requirement at issue and a State's requirement that retail liquor stores be physically located within the State." *Id.* at 1183. The Eighth

Circuit, however, did not generally address the appropriate standard for a challenge under the dormant Commerce Clause. *See id.* The Eighth Circuit in *Sarasota Wine* did not need to address this because it found Missouri's laws did not discriminate against interstate commerce in the first place. *Id.* at 1184. The Eighth Circuit reached this conclusion because Missouri's laws were essential features and "appl[ied] evenhandedly to all who qualify for a Missouri retailers license." *Id.* As is discussed below, Iowa's in-state premises requirement discriminates against interstate commerce and is thus distinguishable from *Sarasota Wine*.

Additionally, *Sarasota Wine* involved restrictions on retailers and the current challenge involves restrictions on manufacturers. As was the case in *Granholm* and *Tennessee Wine*, this distinction is material. While a State may subject alcohol entering into the State to certain regulations through its wholesaler and retailer tiers, it may not discriminate against the origin of that alcohol (i.e., the manufacturer). *See Granholm*, 544 U.S. at 484–85 ("The aim of the Twenty-first Amendment was to allow States to maintain an effective and uniform system for controlling liquor by regulating its transportation, importation, and use. The Amendment did not give States the authority to pass nonuniform laws in order to discriminate against out-of-state goods, a privilege they had not enjoyed at any earlier time."); *Tenn. Wine*, 588 U.S. at 533–35. Although including residency requirements for wholesalers or retailers of other goods discriminates against interstate commerce, the Supreme Court found the Twenty-first Amendment protected these type of restrictions as to alcohol wholesalers and retailers. *See Granholm*, 544 U.S. at 488–89. Such laws treat alcohol "produced out of state the same as its domestic equivalent." *Id.* at 489. *Sarasota Wine* thus did not mark a new direction in the jurisprudence for analyzing a dormant Commerce Clause challenge against liquor laws. Instead, it reiterated what the Supreme Court had already stated—a State may require retailers to be in-state and it may also determine how such retailers

can distribute alcohol to consumers. *Sarasota Wine*, 987 F.3d at 1183. But a State may not engage in protectionism and justify its discriminatory laws under the Twenty-first Amendment. *Tenn. Wine*, 588 U.S. at 532.

For the foregoing reasons, the Court follows the two-step framework in *Tennessee Wine*. The two-step framework starts by asking whether the challenged law discriminates against interstate commerce, not whether the law involves an essential feature of the three-tier system. If the law does discriminate against interstate commerce, then the State must show the law is "reasonably necessary" for its purported nondiscriminatory interests with "concrete evidence" and demonstrate that "nondiscriminatory alternatives" would be insufficient. *See id.* at 533, 540; *Granholm*, 544 U.S. at 493.

Notably, even if the level of scrutiny were determined by whether the challenged law is an "essential feature" of Iowa's three-tiered system, the Court would still apply the same level of scrutiny because the Court would find Iowa's in-state premises requirement not to be an essential feature of the three-tier scheme. As explained more fully below, Iowa's current system is not an unadulterated three-tier system and deviates significantly from the "basic" three-tiered scheme. *See Tenn. Wine*, 588 U.S. at 535 ("At issue in the present case is not the basic three-tiered model of separating producers, wholesalers, and retailers . . . ."). In fact, Iowa's wine-distribution model under the class "A" wine permit system essentially creates a two-tier system for wine within Iowa by merging the manufacturer and wholesaler tiers into a single license—going against one of the primary purposes of the three-tier system in separating the different tiers. *See Sarasota Wine*, 987 F.3d at 1176 ("A central feature of the separated tiers is to prohibit a member of one tier from having a financial interest in a member of a higher or lower tier."). Viewed another way, Iowa's laws allow for in-state wine manufacturers to bypass a "tier" within the three-tier system

while preventing out-of-state wine manufacturers from doing so. The Supreme Court found unconstitutional a similar wine-distribution scheme in *Granholm* when it held Michigan's laws unconstitutional because they allowed in-state wineries to bypass the three-tier distribution scheme while requiring out-of-state wineries to go through all the tiers. 544 U.S. at 473–74. Either Iowa's wine licensing and distribution scheme is more akin to a two-tier system and is not the "unquestionably legitimate" three-tier system, or the Supreme Court has already rejected a similar three-tier system in *Granholm*. Under either interpretation, Iowa's wine licensing scheme requiring in-state premise requirements for a wine manufacturer to receive a class "A" wine permit is not an "essential feature" and would be subject to a heightened level of scrutiny.

## IV.   DISCUSSION

### A.   Standing

In their reply brief, Defendants argue Buckel lacks standing because there is no redressable injury. ECF No. 37 at 6.[5] Defendants assert that if Buckel obtained a class "A" wine permit it would "be of no use" to Buckel because Buckel is not allowed to hold a wholesaler license under Colorado law. *Id.* Buckel, per its limited Colorado license, may sell only its own wine, but Buckel may not buy and wholesale others' wines. ECF No. 36 at 6; Colo. Rev. Stat. § 44-3-403(2). To wholesale others' wine, Buckel would need to obtain a separate license. *See id.* § 44-3-407 (wholesaler's license). Under Colorado law, however, it is "unlawful for a licensed wholesaler of vinous or spirituous liquors . . . interested financially in or with such a wholesaler to be interested

---

[5] Ordinarily, inclusion of a new argument in a reply brief is improper when that argument could have been made in the initial brief. *See* LR 7.1(g) (noting a reply brief is meant "to assert newly-decided authority or to respond to new and unanticipated arguments made in the resistance"); *CruiseCompete, LLC v. Smolinski & Assoc., Inc.*, 859 F.Supp.2d 999, 1009 (S.D. Iowa 2012). The Court, however, briefly discusses Defendants' newly made standing argument to thoroughly address arguments raised by the parties.

financially in the business of *any* licensed manufacturer or importer of vinous or spirituous liquors . . . ." *Id.* § 44-3-407(3) (emphasis added). Colorado law thus forbids Buckel from obtaining a Colorado wholesale license because Buckel is a wine manufacturer.

Buckel, however, does not ask the Court to enjoin or strike *Colorado's* law so Buckel can hold both wine manufacturer and wholesaler licenses under Colorado law simultaneously. ECF No. 36 at 5–7. Instead, Buckel asks the Court to enjoin Defendants from enforcing *Iowa's* law requiring in-state premises for persons seeking a class "A" wine permit, thus putting Buckel on equal footing with in-state Iowa wine manufacturers. *Id.* Granting Buckel's requested relief would thus redress Buckel's alleged injury even if it would cause potential problems for Buckel later on with the State of Colorado. *See California*, 593 U.S. at 671. Said another way, the potential conflict that would arise within Colorado's laws if Buckel obtains a class "A" wine permit is not a bar to the Court redressing Buckel's alleged injury from Iowa's laws. Buckel thus has standing to bring this suit and seek its requested relief for an injunction and declaratory judgment that Iowa's in-state premises requirement violates the Commerce Clause.

**B.    Discrimination Under the Dormant Commerce Clause and Section 2 of the Twenty-First Amendment**

**1.    Iowa's wine licensing and distribution system**

Iowa's alcohol distribution system nominally aligns with the basic three-tier model. *See* Luttrell Aff. ¶¶ 8–13, Defs.' Consol. App. Supp. Mot. Summ. J. and Resist. Pl.'s Mot. Summ. J., ECF No. 35-4; Iowa Code § 123.45 (generally prohibiting an alcohol manufacturer or alcohol wholesaler from having an interest in an alcohol retailer). As already stated, however, its distribution system for wine differs because a single entity may hold a class "A" wine permit allowing them to be both a wine manufacturer and wine wholesaler. Iowa Code §§ 123.173, 123.177. This permit allows the holder to sell directly to a retailer. *Id.*; *see also* ECF No. 35-1 at

3. To obtain a class "A" wine permit, a wine manufacturer must have in-state premises. Iowa Code § 123.173(2). A wine manufacturer without a class "A" wine permit may sell to a holder of a class "A" wine permit so long as the wine manufacturer has a "vintner's certificate of compliance." *See id.* § 123.180. Iowa also allows for direct shipment to Iowa consumers from both in- and out-of-state wine manufacturers so long as the manufacturer obtains a "wine direct shipper permit." *Id.* § 123.187.

### 2.   Iowa's in-state premises requirement to receive a class "A" wine permit

The parties disagree on whether Iowa's laws discriminate against Buckel and offend principles of unencumbered interstate commerce. Buckel argues Iowa's laws violate the dormant Commerce Clause because they discriminate against interstate commerce by allowing in-state wine manufacturers to sell directly to retailers but prohibit out-of-state wine manufacturers from doing so. ECF No. 30-1 at 5–6. In response, Defendants claim Iowa's laws do not discriminate against interstate commerce because they apply "evenhandedly" and require "all wine" intended for resale by retailers "to flow through Iowa's three-tier distribution system" which is subject to the "same system of regulation, inspection, and taxation." ECF No. 35-1 at 3, 11–15. For the following reasons, the Court finds that Iowa's laws discriminate against interstate commerce.

Under the dormant Commerce Clause and Section 2 of the Twenty-first Amendment, state laws may not discriminate against products, manufacturers, or nonresidents of a State. *See Granholm*, 544 U.S. at 472–76; *Tenn. Wine*, 588 U.S. at 534–35. Even if a law is not facially discriminatory, it may still violate the dormant Commerce Clause if it mandates "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Granholm*, 544 U.S. at 472 (citing *Oregon Waste Systems, Inc. v. Dep't of Env't Quality of Or.*, 511 U.S. 93, 99 (1994)).

Iowa's wine licensing laws resemble the Michigan and New York laws struck down by the Supreme Court in *Granholm*. Michigan's law allowed in-state wine manufacturers to ship directly to consumers but prohibited out-of-state wine manufacturers from doing so. *Id.* at 473–74. "The differential treatment require[d] all out-of-state wine, but not all in-state wine, to pass through an in-state wholesaler and retailer before reaching consumers." *Id.* at 474. Similarly, Iowa law allows in-state wine manufacturers to sell directly to retailers but prohibits out-of-state wine manufacturers from doing the same. *See* Iowa Code § 123.173(2). This subjects out-of-state wine manufacturers to additional "overhead increas[ing] the cost of out-of-state wines" to Iowa consumers. *Granholm*, 544 U.S. at 474. As with Michigan's law, the "cost differential, and in some cases the inability to secure a wholesaler for small shipments, can effectively bar smaller wineries from the [Iowa] market." *Id.*; *see also* Buckel Aff. ¶¶ 5–15, Pl.'s App. Mot. Summ J., ECF No. 30-3.

New York's law allowed in-state wine manufacturers to sell directly to consumers so long as they manufactured wine from New York grapes or resold wine from others whose wine was composed from at least seventy-five percent, by volume, of grapes grown in New York. *Granholm*, 544 U.S. at 470. An out-of-state wine manufacturer was allowed to ship wine directly to consumers, but only if it obtained a New York license which required the establishment of "a branch factory, office or storeroom within the state of New York." *Id.* (citation omitted). Iowa's law closely resembles New York's by only providing class "A" wine permits to entities with premises in Iowa. Iowa Code § 123.173(2). This discriminates against interstate commerce because "the expense of establishing a bricks-and-mortar distribution operation [for most wineries] in 1 State, let alone all 50, is prohibitive." *Granholm*, 544 U.S. at 475. Like with Michigan's and New York's laws, Iowa's laws discriminate against interstate commerce through its in-state

premises requirement to receive a class "A" wine permit.

Defendants' arguments to the contrary fall short. First, Iowa does not apply its laws "evenhandedly" to both in- and out-of-state wineries. Instead, Iowa's laws grant "in-state wineries access to the State's [retailers] on preferential terms" by requiring out-of-state wine manufacturers to go through additional tiers in Iowa's system or create an in-state premises. *Id.* Either scenario results in a benefit for in-state wine manufacturers at the expense of burdening out-of-state wine manufacturers, which discriminates against interstate commerce. *See id.* Second, this case is not about "in-state wholesaling." *See* ECF No. 37 at 2–3. While a State may require all wholesalers to be in-state, it may not deviate from the basic structure of the three-tier system and discriminate against out-of-state manufacturers through that deviation. *See Granholm*, 544 U.S. at 466, 487. By merging its wine manufacturer and wholesaler tier under the class "A" wine permit, Iowa discriminates against out-of-state manufacturers by preventing them from selling directly to Iowa retailers when in-state manufacturers may do so—even when those same in-state manufacturers do not also act as wholesalers for others' wine. *See* Iowa Code § 123.173(2). Defendants' framing of the case does not change the fact that in-state wine manufacturers may sell directly to Iowa retailers while out-of-state wine manufacturers may not.

### C. Defendants' Evidence and Justifications

Even if a liquor law discriminates against interstate commerce, a State may justify it under Section 2 of the Twenty-first Amendment by providing "concrete evidence" that the law is "reasonably necessary" to support "public health or safety measures or on some other legitimate nonprotectionist ground." *Tenn. Wine*, 588 U.S. at 533, 539–40; *supra* Part III.C. When a reviewing court decides whether a State's laws are supported by "concrete evidence," the reviewing court is not resolving disputed issues of fact and thus does not go beyond the scope

of a summary judgment motion. *See Tenn. Wine*, 588 U.S. 504 (affirming the lower courts' invalidation of Tennessee's durational-residency requirement on a summary judgment record); *see also Anvar v. Dwyer*, 82 F.4th 1, 10–11 (1st Cir. 2023) (remanding the district court's entry of summary judgment for not "engag[ing] with any 'concrete evidence'" in its decision).

Defendants make various arguments relating to Iowa's legitimate nonprotectionist interests. None succeed. First, Defendants assert the in-state premises requirement promotes effective law enforcement. Defendants maintain that due to limited personnel within the compliance unit, opening class "A" wine permits to entities located out-of-state would effectively create an insurmountable barrier for enforcing laws relating to "illegal importation," "facilitat[ing] a fair and level playing field," and "ensuring proper reporting and payment of taxes on alcoholic beverages." ECF No. 35-1 at 21. Defendants cite the compliance unit's detection of violations in the past as evidence the unit is effective within the current system. *Id.* Defendants, however, do not provide "concrete evidence" to show that allowing out-of-state manufacturers to sell directly to retailers would prevent effective enforcement of Iowa's laws. As it stands, Defendants' assertions are "mere speculation." DeMario A. Luttrell, Iowa Department of Alcohol and Tax Compliance Division's Bureau Chief over sales and excise tax and alcohol regulation, cites no studies supporting the assertions in his affidavit. *See* Luttrell Aff., ECF No. 35-4 at 10–14. *Granholm* rejected this concern because "improvements in technology have eased the burden of monitoring out-of-state wineries" and "[f]inancial records and sales can be mailed, faxed, or submitted via e-mail." 544 U.S. at 492. Indeed, *Granholm* held nineteen years ago that advances in technology eased any potential burdens for out-of-state monitoring activities, and that conclusion is even stronger today.

Second, Defendants argue expanding the class "A" wine permit to out-of-state entities

would lower the reliability and efficiency for ensuring compliance with wine gallonage tax reporting, collecting taxes, and detecting other violations due to the low number of enforcement personnel. ECF No. 35-1 at 21–23. Advances in technology also undermine this argument, and there is a lack of "concrete evidence" proffered to support the claim. *Granholm*, 544 U.S. at 492. Further, Iowa currently allows out-of-state wineries to ship directly to consumers and is seemingly able to audit and properly tax these permittees despite there being 1,195 active wine direct shippers throughout the United States. ECF No. 35-1 at 23. It likely would be easier for Iowa to regulate shipments to retailers than to consumers as Iowa retailers are licensed entities within the State, whereas individual consumers are not. *See* Iowa Code § 123.30 (classifications for retail alcohol licenses).

Third, Defendants contend the in-state premises requirement creates a connection to the wine manufacturer's community, thus promoting temperance and care for the community generally. *See* ECF No. 35-1 at 24–25. Defendants also suggest the in-state premises requirement subjects the holder of a class "A" wine permit to the "negative externalities of their business activity" which promotes self-policing. *Id.* at 23. Defendants contend in-person interactions with investigatory staff and auditors also helps improve educational outreach and voluntary compliance with rules by permittees. *Id.* These justifications are difficult to accurately measure given their amorphous nature, not to mention the lack of "concrete evidence" showing they are "reasonably necessary." But even assuming these community-connection arguments to be true, the Supreme Court in *Tennessee Wine* rejected similar justifications. 588 U.S. at 542. There, the Supreme Court noted that a retailer directly across a state border would be prevented from selling to its immediate neighboring community due to the discriminatory laws. *Id.* Whereas the owner of retail store living hundreds of miles away from the actual location of the retail store, but still within the State, would

be allowed to sell in the State despite having no connection to the community. *Id.* The same logic applies for wine manufacturers. This argument is even more pertinent here because Buckel would not have direct interactions with the community and instead would only sell wine to Iowa retailers—where educational initiatives and community-connection would likely be far more meaningful. As such, even if this justification was supported by concrete evidence, the Court would nevertheless reject it because similar concerns were not found to be a valid justification by the Supreme Court when applied to retailers. *See id.*

Finally, Defendants argue limiting the number of places where wine is imported into Iowa and then distributed throughout Iowa promotes the health and safety of Iowa citizens. ECF No. 35-1 at 21, 23. Defendants contend they currently lack the necessary resources to conduct similar enforcement oversight to entities located outside Iowa's borders due to the heightened time and travel expenses. ECF No. 35-1 at 21. Given that there are 1,195 wine direct shipper permittees throughout the United States and more than 9,000 retailers eligible to sell wine within Iowa, Defendants claim that expanding the number of class "A" wine permittees, which is currently around 150, would strain resources. *Id.* at 23–24. While these arguments are more convincing, Defendants still do not provide "concrete evidence" that the in-state premises requirement is "reasonably necessary" to achieve these interests. There is no concrete evidence the number of class "A" wine permits would expand to the point where enforcement oversight would become infeasible and endanger public health and safety. Further, the wine would first go to a licensed in-state retailer where safety checks could be performed, even if such checks would be less efficient than checks performed at wholesalers. Defendants also point to no evidence in the record demonstrating why allowing out-of-state wine manufacturers to sell directly to Iowa retailers would be more harmful to public health and safety than allowing out-of-state wine manufacturers

to sell directly to consumers, as is permitted under Iowa law. *See* Iowa Code § 123.187. Thus, while the in-state premises requirement for class "A" wine permittees has some arguable connection to public health and safety, there is no "concrete evidence" that the requirement is "reasonably necessary" to achieve that valid interest. *See Granholm*, 544 U.S. at 492; *Tenn. Wine*, 588 U.S. at 533. The Court finds the above interests are not supported by concrete evidence, were previously rejected by the Supreme Court as not valid, or both.

Even assuming the above interests were supported by concrete evidence demonstrating Iowa's laws were reasonably necessary to achieve them, Defendants have not shown that "nondiscriminatory alternatives" would be insufficient. *See supra* Part III.C. There are various ways Iowa could support these interests without discriminating against interstate commerce. *See, e.g.*, *Tenn. Wine*, 588 U.S. at 543 ("[T]he State of course remains free to monitor the practices of retailers and to take action against those who violate the law."); Iowa Code § 123.184(1) ("A penalty of ten percent of the [wine gallonage tax] shall be assessed and collected if the report . . . is not filed and the tax [not] paid . . . ."). Iowa could implement limitations on the number of class "A" wine permits issued. *See Tenn. Wine*, 588 U.S. at 543 ("State law empowers the relevant authorities to limit . . . the number of retail licenses . . . ."). The objectives could also be achieved through "evenhanded licensing requirement[s]." *Granholm*, 544 U.S. at 492. Additionally, Iowa could implement a system where only licensed wine carriers can transport wine directly to retailers from wine manufacturers to ensure additional oversight, as is done now with wine sold directly to consumers. *See* Iowa Code §§ 123.188 (wine carrier permit and licensing requirements), 123.187 (wine direct shipper permit and licensing requirements). Even if disproving nondiscriminatory alternatives is not required, but is merely persuasive, the above alternatives still bolster the Court's prior conclusion that Defendants have not met their required showings. *See, e.g., B-21 Wines*,

36 F.4th at 225 ("Although consideration of nondiscriminatory alternatives could have some relevance . . . it does not transform the applicable framework . . . .").

For the reasons set forth above, the Court finds Defendants' asserted interests do not justify Iowa's discriminatory laws under Section 2 of the Twenty-first Amendment, and therefore Iowa law violates the dormant Commerce Clause. U.S. Const. art. I, § 8, cl. 3.

### D.     Remedy

Defendants argue that ruling in Buckel's favor would result in the creation of out-of-state wholesalers. *See* ECF No. 35-1 at 26. If this occurred, it would almost certainly violate the three-tiered distribution scheme courts have repeatedly approved as requiring wholesalers to be in-state. *See Sarasota Wine*, 987 F.3d at 1176. However, Iowa law contains a general severability provision giving explicit authority for courts to sever invalid portions of the Iowa Code:

> If any provision of an Act or statute or the application thereof to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the Act or statute which can be given effect without the invalid provision or application, and to this end the provisions of the Act or statute are severable.

Iowa Code § 4.12. The Court "leave[s] the valid parts in force on the assumption that the legislature would have intended those provisions to stand alone." *Breeden v. Iowa Dept. Corrections*, 887 N.W.2d at 602, 608 (Iowa 2016) (citation omitted). The Iowa Supreme Court declared "the cardinal principle of statutory construction is to save and not to destroy." *Id.* at 609 (alteration removed) (citation omitted). As was the case in *Tennessee Wine*, this Court severs the unconstitutional provision of Iowa law at issue in this case without otherwise disturbing more than necessary of Iowa's alcohol distribution system. *See Tenn. Wine*, 588 U.S. at 539.

As such, the Court limits its holding to finding Iowa Code § 123.173(2)'s requirement that "[a]ll class 'A' premises shall be located within the state" is unconstitutional as applied to wine

manufacturers. An out-of-state holder of class "A" wine permit may <u>not</u> sell others' wine directly to retailers. An out-of-state holder of a class "A" wine permit may only directly sell wine they have manufactured themselves. That is, the out-of-state holder of a class "A" wine permit may not use the permit to wholesale others' wine or otherwise act as a wholesaler of wine.

## V.   ATTORNEY'S FEES

In Buckel's complaint, it requests "an award of attorney's fees, costs, and expenses pursuant to 42 U.S.C. § 1988." ECF No. 24 at 6. Outside of this initial request, Buckel does not make specific requests relating to attorney's fees, costs, or expenses. Title 42 U.S.C. § 1988(b) provides in civil-rights actions, "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee." Despite this permissive language, the Supreme Court has interpreted Section 1988 to entitle a prevailing civil-rights plaintiff to a fee award, absent "special circumstances [that] would render such an award unjust." *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983). Buckel is the prevailing party because the Court grants a portion of its motion for summary judgment. Within fourteen days of the filing of this order, if Buckel still seeks an award of attorney's fees, costs, or expenses, it shall file with the Court a motion detailing this request and the specific amounts requested.

## VI.   CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that Plaintiff Buckel Family Wine LLC's Motion for Summary Judgment with respect to Iowa Code § 123.173(2), ECF No. 30, is **GRANTED** in part as detailed above.

**IT IS FURTHER ORDERED** that Defendants Mary Mosiman, Stephen Larson, Brenna Bird, and Stephan K. Bayens's Motion for Summary Judgment with respect to Iowa

Code § 123.173(2), ECF No. 35, is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants Mary Mosiman, Stephen Larson, Brenna Bird, and Stephan K. Bayens's Motion for Summary Judgment with respect to Iowa Code §§ 123.3(40) and 123.175(2)(c), ECF No. 35, is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff Buckel Family Wine LLC has ten days after the filing of this order to file a notice with the Court addressing the status of its claim regarding Iowa Code § 123.176(9).

**IT IS FURTHER ORDERED** that if Plaintiff Buckel Family Wine LLC seeks attorney's fees, costs, or expenses, it shall file a motion with the Court detailing this request and associated amounts within fourteen days of the filing of this order.

**IT IS FURTHER ORDERED** that all other deadlines are suspended, and the trial date is removed from the calendar. Any further matters will be addressed by separate order.

**IT IS SO ORDERED.**

Dated this 30th day of September, 2024.

REBECCA GOODGAME EBINGER
UNITED STATES DISTRICT JUDGE